Good morning. I agree with the basic part. I'm Chris Sullivan. I'm part of the M. E. Hepburn co-owner of Renew LLP and Liquidating Tether. It's acknowledged by both parties. In the courts below, there's an overriding question here. Was Mr. Neuman a shareholder after he signed the 2007 letter agreement and at the time of the dissolution? The answer to that question is no, that I can't answer. First, in the bankers' support, therefore, or as a matter of law, the bankers were getting the agreements differently. First, it is so stated that Mr. Neuman's shares were never repurchased or returned, and his capital contribution of $431,000 was never paid back. Thus, under the most common definition of a shareholder, he was a shareholder. He held shares. Well, he held shares, but ordinarily, they are the percentage in the income, and that's entirely different. He was on a straight penny after the 2007 agreement. How do you, the bankruptcy judges, found it that way? It's a pretty strong finding. It looks like a finding of fact. I think it should be considered a mixed question of law and fact, Your Honor. And I also think it's exaggerating the significance of the change of the perspective of how he was to be compensated versus his status as an owner of the company and as to be able to pay for the profits of the company, which was what still remained even after he became a fixed income shareholder. Well, when I was struggling as a young associate, I think the inputs of the income, he's had a substantial difference. So, whether he's an employee or a partner or shareholder, but it doesn't override his deep, specific status that he had pursuant to the agreements as a shareholder. I agree with you with that, but when you take your cousin's testimony and then you cross-reference multiple agreements and the dissolution plan and liquidation decisions, it almost seems to me like he's a hybrid, since the court needed to make a decision. He's a hybrid in that he's, as the law says, he's getting a fixed income plus the potential for a bonus. He's not getting a share of the profits like an ordinary partner would be under your normal partner employment agreement here. And in fact, they call him a fixed income shareholder, and you don't really have an agreement, and his agreement, that defines what that is. So, that's why I'm wondering if this isn't a hybrid that the court needed to make a decision on. Well, that's why I think the court actually got on track, Your Honor, because there are other fixed income shareholders whose agreements are included in the insurance record, and it all makes it clear there's one class of shareholders. Some of whom are paid according to a different formula, the fixed income formula. Well, wait, just, can you just go through just so I can make sure I heard that right? There's one class of equity owner shareholders. Right. He had prior capital contribution, which is addressed in his partnership agreement for the possible payout down the road, but he is not a fixed income shareholder, is he? No, and when the shareholders actually retire and they became employees, they started to be repaid their capital contributions. So, there was a distinction, a clear distinction between the retired shareholders who are no longer shareholders, and the fixed income shareholders who remain shareholders held on to their stock and were not repaid their capital contributions. Second, he retained all of the attributes. If somebody had, somebody had resigned from the firm as a shareholder, what would have occurred? They would have submitted a formal resignation, and then what would happen next? Are there serious recurrences of something to be repurchased? Their capital contributions are returned. On out, what happens? They return, they return over a set schedule, Your Honor, and that always happens in every situation, and then critically under the partnership agreements and shareholder agreements, once you've resigned or were terminated, you were clearly not entitled to any more income. So, Mr. Newman continued to vote. He continued to exercise all the other rights and privileges of a shareholder. He left the ballgame with the tickets, but is there any indication that he was involved in the decisions like the separation of profits at the end of the year? He was treated no differently than any other shareholder, Your Honor. I mean, there was a compensation committee that was made up of shareholders that made those decisions. Mr. Newman had every right that every other shareholder had to participate in that process, to vote on who those people were, and to not be in a situation where he had to resign. So, Mr. Newman's estimated percentage becomes key, because he had a listed percentage in order to, as reflected, that his vote counted in the percentage of his attributed percentage, as Mr. Hubbell explained in his testimony. Was that a theory from year to year? You would take that $775,000 and divide it by the total profits, is that what gave him the percentage? That's correct. He would divide it by the total profits, and that was very easy. Was there anybody other than shareholders that were permitted to vote on that? No, Your Honor. There were not, and he was paid by the professional corporations. Only shareholders were paid by the professional corporations. The professional corporations were given a certain amount of money that was the limit of what they could distribute to the shareholders, and that was defined by the net profits pursuant to the partnership agreement in the glossary, Your Honor. Do you have other fixed income shareholders? Were they also voting on a percentage share basis of their fixed income? Absolutely, Your Honor. And those are the ones that, again, they're in agreements and inserts of record, and then if you look at the multiple lists that were submitted, also in the record of the shareholders, they're on the list of shareholders. There were shareholders, plain and simple. Is there anything he didn't get to do, then, to have an expectation of share in the profits? No. Now, one of the issues, of course, is similar, Your Honor, in the documents, is things were going downhill, if you will. Sometimes he's talked of local partner draws, of course, were withdrawn or held or that sort of thing. As a fixed income shareholder, did he continue to receive monies even if the partners were not receiving their draws, or their draws were reduced? No. The draws were eliminated in September of 2008, and that's when Mr. Newman was, his draw was cut off, and that was also reflected in the plaintiff's position in the agreement. So he then was treated like other partners as opposed to an employee? That's correct. And the employee associates or of the outsell or non-shareholders would continue to get their money, at least until things went south? Right, right. So they continued to get their money, and in fact, they sued, actually, you know, as a class action of both the employees, and it was sued as significantly as the only fixed income shareholder that made any claims to continuing compensation under the agreements. I was somewhat surprised that the revenue of the contract, which did a lot of recruiting, was there, at this particular time, was there some pressure to get this done? No, I don't think there was a pressure to get this, to get it done. It was a friendly process, but it doesn't look like adversaries at all got together and took interest in the contract, so I wonder if there's anything behind that. I don't think so, Your Honor. I mean, there were other models that Hillerman was following when they set up the same procedure or changed the compensation method of other shareholders, and it wasn't, it wasn't an earth-shattering change. It was a change that's changed the method of his compensation spending. It wasn't like he was terminated or eliminated as a shareholder. I think that helps explain the brevity of the letter, and it was, you know, commonly understood by certainly most of the shareholders at Hillerman that there were, some of the shareholders were paid on a fixed income basis. If some of the other recruiters substantiated the statement he just made, that's how well everybody else felt? Yes, Mr. Hillerman testified to that, and Mr. Abel testified to that as well. Did they testify to how other people thought? They testified that they understood, they understood what the other shareholders knew, because the other shareholders frequently called them about the intricacies of the compensation, and when the annual shareholder unit list was published, there was a specific notation that said that the fixed income shareholders are being notified separately of their compensation. So, Mr. Abel is the managing partner of the firm, and Mr. Hayden is the managing partner of the San Francisco office in the California PC, frequently received calls from shareholders asking about the details of how much the fixed income shareholders were paid. So, they had a basis, and it was admitted in advance their understanding of what other shareholders knew at the time. It was a little bit of head-spinning in Mr. Hubbell's testimony for me about whether someone in Mr. Newman's position was being paid out of the PC or the LLP, and the difference between who cuts the checks and where does the money come from. One, does it matter? And two, what's your position on it? Which is, did he pay him? He was paid, clearly, by the PC, and I think it's in the stipulated facts. It's evidence by the W-2 statements that the shareholder was paid, and it is a critical distinction, because the people who are paid by the LLPs, they were expensed in the financial statements. The factor on the revenues, do you think the revenues, you subtract the expenses, you get the net profits, that those net profits were delivered to the PCs to pay the shareholders? So, it's a critical difference, and there's no dispute in the record that Mr. Newman was paid by the PCs. I also think, I think it's positive that he was a shareholder, but I also think, under the terms of the letter agreement, it was clearly contemplating an annual cost, on which his salary would be set. Therefore, the dissolution resulted in a change of circumstances that all has an independent reason to cut the economist's claim here, and also the plan of the pay and confirmations coordinated to claims. This is clearly set forth in the plan, and it's specifically listed as a subordinated shareholder whose claims are subordinated. I want to give you some time for, I want to have one last question. Although it's called an employment agreement, it's really a partnership agreement in ordinary terms that he entered into initially. Correct. What is your position on what, if any, terms of that employment agreement survived the other agreement, which he entered into, which I think isn't complimentary? I think all the other terms survived. I think the only refinement was in that, that his compensation was handled slightly differently, and I don't think it made or inconsistent with the partnership or the employment agreement. Thank you. Good morning, everyone. If I may, I'd just like to respond very briefly to a few things that were just said before turning to my argument. First, there was the question about whether shareholders generally knew the existence of fixed income partners or shareholders, and as to that, I would call the court's attention to the biggest importance finding, in fact, which was that when Mr. Newman prepared his proposal for salary abuse compensation, he understood that this represented a unique move, for instance. So, I agree with you, Roger, that whatever a manager, a teller, might have thought other people knew, the relevant factors, what Mr. Newman knew, and the trial court found that he didn't. He thought this was a unique one-off situation. He was also, at that point, entitled to access to the firm's financial data. Was he not? Because he definitely was a shareholder before he signed that piece up until he signed the agreement. Yes, Your Honor, there was no evidence in the trial about the extent to which shareholders had access to financial data, so I can't intelligently comment to that. Why do you say it's an employment agreement? I believe it's an employment agreement that says he has access to it. Thank you. That's being based on findings of fact, that the District Court made findings of fact. It was challenged by your adversary. Of course, if those were findings of fact, then I will review for erroneous findings. If there's no such deference given to the bankruptcy court, what's your position as to whether those three critical areas listed by the bankruptcy court are findings or mixed questions? I may not be understanding the critical areas. One of them, contract. And that Newman was not prevented, because he was prevented from going ahead, that didn't interfere with the agreement. And that Newman's claims are not subordinated by the plan. Well, let me take one piece. First of all, I think that the important analysis has to do with the letter agreement and what it did or did not do. And in a sense, I think that the District Court's oral evidence analysis really ties together all of the factual issues and response passed to the court's concern about whether these are factual findings or conclusions of law. What was attempted at the trial court was a lot of oral testimony about what went on at fixed income shareholders in general, much like you've heard this morning. And the District Court, I think, applied much more rigorous analysis. I'm talking about the District Court now. I agree, Your Honor. I'm just trying to point out the analysis, which I think is critical. And that is the District Court looked to this decision in Brinderson-Newburgh, which explained how California law deals with oral evidence. First, you see if there's an integration clause. And if there is, you decide whether Crawford interpretation is reasonably, whether the document is reasonably susceptible to the Crawford interpretation. And the District Court, then obviously everyone found that there is an integration clause in the letter agreement. And then the District Court looked to see whether the Crawford interpretation was reasonably susceptible. So the letter agreement says your employer will be the LLP. The Crawford interpretation is that really means the professional corporation. The letter agreement signed by the management shareholder of the LLP, not a representative of the corporation, the Crawford interpretation, is that still really the professional corporation. The underlying basic documents say that the shareholder compensation will be on the basis of contributed percentages. The letter agreement says that it's going to be compensated over the salary. The shareholder or the employment agreement says this is the only way that shareholders can be compensated. If you're going to change this for any shareholder, you have to choose the same way for every shareholder, clearly inconsistent with the letter agreement. So what the District Court said is, although these findings, the facts, and all of this discussion, as well, was very interesting at the end of the day, it all probably should be excluded as part of the California's Coral Evidence Rule. The real question is, does the letter agreement govern? And are the basic documents still possibly involved? The District Court said, as a matter of law, you can't look to the basic documents. This interpretation is simply not reasonably sensible, and you have to look exclusively at the letter agreement. So that's a long way around. Yes, I do think that Baker's court made appropriate findings. In fact, yes, I do think that they couldn't be of greater concern. It's very erroneous. But I think the District Court's analysis is more rigorous, and it gets really to the point, which is that this is, that the letter agreement really is the beginning of everything. If the letter agreement is sort of the forequarters of the inquiry here, the word shareholder is used throughout the letter. No place is used for all the denying consistency. And I think you gave a very good answer to me. I think the best point for your side is the fixed income. It seems to me that a very strong point on the other side with voting rights. So I'll tell you about the voting rights. I would like to, I have to. I would call the court's attention to a couple things. First of all, when Mr. Newman was asked to reserve his proposal for separate employment, as you said, in agreement 307, he said, well, I would not have any voting rights. I would continue to receive materials in three different months. That's not true, is it? You didn't have anything, right? No, but as I understand it, it was in two months. No, it was not in two months. But you had it for all evidence. You just walked outside of the forequarters of your agreement. You told us it was supposed to be. So he asked me to be careful here. I agree, you're right. So if you look at the four corners of the 2007 agreement, he had voting rights and he exercised those rights. Is that true? It is true. Tell me why that doesn't make you sure that you're voting. So the testimony at the trial was that he had voting rights. So if you're in a league and you want us to go look outside of the four corners or not, he noted that he did not exercise voting rights until the managing shareholders secretary called him up to testify. But in fact, a different member of management testified that one of his chores at the firm was to call up people and pester them to vote so that they would get to the court. And Mr. Newman said, I felt so bad after I was called up and pestered, she goes. Every time after that, I always voted. I always voted with management. Am I right that way? That's very true. I think it's important because if you're trying to weigh what means something to someone, I believe that this is not what it means to me. He's a well-educated individual. He was well compensated. He's a lawyer, as I tried in the agreement, he signed voting. So it doesn't matter if he didn't think he wanted to vote or he had not proposed that he get voting rights. The agreement says he has the right. Well, yes, but what does that say about how important that is? Because he didn't even ask for it and it's stressed upon him. Well, he signed this agreement. There's no suggestion there's any adhesion on the part of the firm. Well, you can't go out and let somebody feel bad because they weren't living in a shareholder rights. Your Honor, I think that the point is that it was irrelevant, that voting was, in fact, irrelevant. It was, in fact, a chore. It was, in fact, a chore that management pestered people to perform and that after having been pestered, Mr. Newman performed that chore. But if you're trying to figure out who was he... Did he vote in a protest? Did he vote to assert that his vote shouldn't count? Well, he didn't think he had voting rights and they're pestering him to offer the adhesion. Is he going, I can't do that or you can vote that or I don't know why you're telling me this. This isn't appropriate. It was his testimony. He basically said, since I don't have an attributability, I don't know why I can't vote. Did he ever tell anybody when he was voting that he didn't think they should count his vote? He responded that he didn't think he had a vote when he was first pestered and he was told to vote. But the agreement doesn't... Does he support voting? Doesn't... I agree. I agree. But all I'm trying to suggest is that what the trial court found as critical, which I think this court should also find as critical, is that the change from shareholders who receive a percentage of the profits to a fixed income salary employee was a huge change. And it was a change that really dominated Mr. Giffen's position at the firm. And it was a change that the bankruptcy court found was dispositive of the industry. Yes, Heller-Ehrman enjoyed the benefit of not having paid off his capital contribution. At the time, they did it for four more years. They didn't even have to pay off their capital contribution. It never did. It just turned out. And that didn't matter. The capital, the shares of Scott, were all just book entries at the corporation and had no practical significance. The fact that he was retired doesn't change anything. The fact that he was referred to as a shareholder, the evidence is that retired former shareholders who still work with the firm were still referred to as shareholders. The shareholder was an honorific, and it was a gesture of respect. But it was not treated as a technical analysis. So yes, he had the honorific. He had the better baseball tickets. He had the office selection. But in fact, he had become just a salaried employee. And those are the facts before the bankruptcy court. And the bankruptcy court promptly found that that meant that he was not a shareholder. If I could turn it briefly to the prior affiliation to the time of disclosure. The employee also asked you, he referred to these honorific shareholders, et cetera. But when he left the firm and assumed that status, there was an actual termination of the employment agreement with the PC. Was there not? There was a single document, not much larger than Mr. Newman's. The answer is no. Was there a termination of the PC? I believe it was all put together. Okay. It's not the council agreement that was included. But is there any termination of that agreement vis-a-vis Mr. Newman? I'm not aware of one. Okay. So let me turn to the two plans. The plan of disclosure has two relevant provisions. The one, which Alan has stressed, is paragraph 11, which says specifically that there's nothing in return of capital to shareholders. But also says that shareholders can pursue claims to the confirmation of contractual claims if the base permitted it. And as the trial court found, the base has long since been resolved. And the other case, this is with their involvement was no longer significant. The other provision, which the bill did not include, but is in the supplemental executions of record, is paragraph 15 of the plan of disclosure, which expresses the title of no waiver, and expresses the status that nothing in this plan of disclosure will operate to waive a fearful truth right to assert a claim for compensation or a contractual claim. So the plan of disclosure did not bar a claim that Mr. Newman asserted. You then go forward to the plan of liquidation, and while it does identify him as a subordinate and former shareholder, you need to look at the plan and see what does that mean. And what that means under the plan is the same treatment as you did under the plan of disclosure, as the plan of liquidation does not say. And in addition, you throw out all of the claims of a subordinate and former shareholder. It simply says, the treatment of former subordinate shareholders, subordinate and former shareholders, is the treatment contemplated by the plan of disclosure. And yes, I would finally say that as I view it in the analysis of this bill,  that I was referring to earlier about the district court, the critical document, the critical issue is the letter agreement. And to respond to Judge Holst's question about deference, it's my understanding that while conclusions of law are mixed, questions of fact and law are not treated with deference. Where a trial court interprets a document with a contract based on extrinsic evidence that is subject to the clear and erroneous standard. And here, I think what's going on at its core is the trial court is interpreting the letter agreement based on extrinsic evidence. And so to the extent that the court wishes to look to what happened at the trial court, I think that the clearly erroneous standard applies to its interpretation of the letter agreement. Obviously, I think the court could also look to the analysis proposed by the district court, implying that there was no place for literal evidence here. And again, the key issue is the letter agreement. Thank you for your time, Mr. Speaker. Thank you. I'd like to go to Judge Holst's question first. In the ERI page four, it's where the bankruptcy court made four findings of fact. That would be a true finding of fact. It would be the finding of fact as to whether or not Mr. Newman had a contributive percentage. And I think that fact, that finding, was fairly erroneous. The other findings are more in conclusion's law and as a mix. For example, whether the 2007 letter agreement was an ovation is a question of law based upon the interpretation of the contract. I'd like to go to Judge Bobby's question two in terms of the voting. A note that when Mr. Newman voted for the plan of dissolution, not only did he vote for that affirmatively, and this is the DER in 291, but he did it with a condition. He said, this approval is with the understanding that exhibit B to the dissolution plan is not in millions of dollars, but rather thousands of dollars. So clearly he was attributing some significance to his vote, certainly on such an important document as the plan of dissolution. I think Mr. Newman's counsel is mixing concepts because on the one hand, he wants to say that the letter agreement is fully integrated, and on the other hand, he wants to say we should defer to the bankruptcy court's rulings because it was based on evidence that went beyond the four corners of the agreement. I don't think the four corners of the agreement can be interpreted to result in an ovation of all the other underlying agreements. This is the second, fourth, and the Hamidor, and also this case is much more like the Davies machine case, first of all, in Mountain Club, in which there was a change in the method of compensation that did not amount to an ovation of the underlying agreements. It was just a supplement. I think Mr. Newman, from his perspective, he maybe felt like there was an emotional or psychological difference being a fixed income shareholder versus every other shareholder. The key is the legal agreements, the legal terminology, and the rights and powers that go along with being a shareholder, and those matter. And those especially matter when you're an owner of a corporation and you're trying to stand in line with the creditors and get paid a continuing salary, and in and of them, you have to do it based upon your legal status. It's legal status as a shareholder, as it's a fourth and final agreement, and all the underlying agreements. Let me see one question your counsel brought up, the suggestion that if the code, we review the bankruptcy judge's determination, that we should use the analysis of the district judges of that bankruptcy judge opinion, if we went that direction, where would you find fault in the district judge's analysis? I think the district judge has followed the same errors of the bankruptcy court in terms of giving too great a significance to psychological changes with respect to the impact of being a fixed income shareholder versus a variable income shareholder, when the critical difference is are you a shareholder or are you not? Is the court correct in ruling on the parole evidence rule? I think the relevant parole evidence rule would be the other agreements, the other fixed income shareholder agreements, but I think the best interpretation is the letter agreement itself was an integrated document that provided for limited modification of other agreements and did not alter your status as a shareholder by the very terms of that letter. So even if the parole evidence rule kept out all of the vocal evidence, you think all the documents themselves would result in your shift to kind of different tracking? I think they are. Thank you. Thank you. I'd like to thank both counsel for your argument this morning. However, Irwin versus Newman is sent to the next case for argument. Nancy Linder versus Golden Gate Bridge.
judges: Wallace, McKeown, Bybee